## SEIBERT et al. v. MARKHAM et al.
### No. 5175.

Court of Civil Appeals of Texas. Texarkana.

March 17, 1938.

Rehearing Denied March 24, 1938.

Storey, Sanders, Sherill & Armstrong, of Dallas, for appellants.

Bradley & Bradley, of Groesbeck, and Samuels, Foster, Brown, & McGee, of Fort Worth, for appellees.

JOHNSON, Chief Justice.

Prior to June 10, 1909, J. L. Markham and Aaron Brosius were partners engaged in the sawmill and lumber business in Hopkins and Franklin counties, Tex., under the firm name of Markham & Brosius. On the date mentioned Aaron Brosius died intestate. He was survived by his widow, Matilda, and his two daughters, Olive and Ruth Brosius, who were his sole heirs. When Aaron Brosius died, the partnership of Markham & Brosius owned 2,471 acres of land located in Hopkins and Franklin counties, and some personal property. The partnership indebtedness was approximately $43,000, which was about $10,000 more than the value of the partnership property. Shortly prior to his death, Aaron Brosius and his family had moved from Hopkins county, Tex., to Evansville, Ind. After his death the widow and daughters continued to live in Indiana. Mr. Markham took possession and control of the property and affairs of the partnership upon the death of Mr. Brosius. After her father's death, Olive Brosius came to Hopkins county and made an investigation of the condition of the partnership affairs. Afterwards Mr. J. L. Markham visited Mrs. Brosius and her daughters at their home in Indiana, and discussed the business affairs of the partnership. What was said or agreed up-

on, if anything, in this discussion with respect to the partnership matters is not shown in the record. Mr. Markham returned home, and on November 15, 1910, acting in his capacity as surviving partner of the partnership of Markham & Brosius, he executed a deed conveying to himself, J. L. Markham, individually, the entire partnership assets, including and describing the land here in controversy, in consideration of the assumption of the payment by him, J. L. Markham, of the entire partnership indebtedness and releasing the estate of Aaron Brosius, deceased, of all claims by reason thereof. The deed lists certain creditors of the partnership, their post office addresses and the amount due each, totaling $43,172.90. Of the indebtedness listed $24,-769.58 was due by the partnership to J. L. Markham individually. The deed was properly acknowledged before a notary public and duly recorded in Hopkins county and in Franklin county. J. L. Markham then paid off and discharged all the partnership indebtedness. Continuously thereafterwards he occupied, used, and claimed exclusive title to the land. On May 31, 1911, a suit was filed in the district court of Hopkins county, Tex., by Mrs. Matilda Brosius, Ruth Brosius, and Olive Brosius against J. L. Markham, wherein plaintiffs sought, among other things, cancellation of the above-mentioned deed and to recover an interest in the property. The petition in that suit was signed by Durre & Curry, and Frank E. Scott, attorneys for plaintiffs. On August 26, 1913, a judgment of dismissal was entered in the cause because of the plaintiffs' failure to appear and prosecute the suit. In July, 1913, J. L. Markham conveyed 486 acres of the land to T. L. and H. M. Harper. The deed was duly recorded and the Harpers went into possession and continuously thereafter occupied and claimed title to the 486 acres. J. L. Markham died in 1919, and by his will, duly probated, left his property to his widow and children. Mrs. Matilda Brosius died in 1926, and by her will, duly probated, left her property to her two daughters, Olive and Ruth. Olive Brosius was thirty-two years of age when her father died in 1909. She married Robert A. Williams in 1920. Ruth Brosius became twenty-one years of age in 1912. Within a few days after reaching her majority, she was married to Clarence D. Seibert.

On January 30, 1934, this suit was filed in the district court of Franklin county, Tex., by Ruth Brosius Seibert, joined by her husband, Clarence D. Seibert, and Olive Brosius Williams, joined by her husband, Robert A. Williams, in an action in trespass to try title, seeking to recover a one-half undivided interest in the 2,471 acres of land, against the widow, heirs, legatees, and the independent executor of the estate of J. L. Markham, deceased, and a number of other persons and corporations, including J. T. and H. M. Harper. The defendants Markhams and Harpers answered by pleas of not guilty and the several statutes of limitation. The answers contained other matters not necessary here to mention. Trial of the case to the court without a jury resulted in a judgment that plaintiffs take nothing by reason of their suit and awarding recovery in favor of the defendants Markhams and Harpers. At the request of appellants the trial court filed his findings of fact and conclusions of law. Plaintiffs have appealed.

The substance of appellants' first six propositions asserts that the deed dated November 15, 1910, executed by J. L. Markham, survivor of the partnership of Markham & Brosius, to himself, J. L. Markham, individually, is void as distinguishable from voidable. Validity of this deed is not essential to sustain the trial court's judgment, hence we do not determine that question. The trial court's judgment is sustained by appellees' pleas and proof in support thereof under the statute of ten years limitation. Vernon's Ann.Civ.St. art. 5510.

As bearing on the question of limitation, the trial court found:

"J. L. Markham acted fairly, honestly and in good faith in all matters in connection with taking over the property and paying the debts and closing up the affairs of the partnership; and was guilty of no fraud or concealment of any fact relating to same.

"That the said J. L. Markham from and after the execution of the deed set out in paragraph eleven on the 15th day of November, 1910, until the date of his death claimed to own all of the land involved in this suit until he conveyed the several tracts which he conveyed to the Harpers and thereafter said J. L. Markham and the other defendants named in paragraph Twenty-three hereof, (widow, heirs, legatees, and legal representatives of the estate of J. L. Markham, deceased), claimed all of said land except that sold the Harpers and after such sale said Harpers claimed the several tracts so purchased by them up

to the time of the trial, and said defendants respectively during all of said time had and held peaceable and adverse possession of the several tracts of said land described in their respective answers herein, (a) cultivating, using and enjoying the same and paying all taxes thereon before the same became delinquent, and claiming said lands under deeds duly registered (except Harpers did not pay all taxes before they became delinquent), for and during each five year period after the date of said deed, the 15th day of November, 1910, and none of said defendants deraigned their title through a forged deed; (b) and for the same time, said defendants were in possession of their respective tracts of land, as aforesaid, and had and held peaceable and adverse possession thereof, using and enjoying the same for and during each ten year period from and after November 15, 1910, up to the time of filing this suit on the 30th day of January, 1934. * * *"

"That continuously after J. L. Markham conveyed the lands to the Harpers (July 1, 1913) which is described in their answer, the Harpers were in the open, notorious, exclusive possession of the lands described in their respective answers until the trial of this cause, and were openly claiming it and the fact was notorious and well known by the public generally, and the same is true as to the Markham defendants from and after November 15, 1910, and up to the time of this trial.

"That defendants, the Markhams and the Harpers, have had the lands described in their answers fenced and have maintained such fences so as to maintain and retain and they did hold and retain actual exclusive and adverse possession of their said lands, respectively during all of the years from November 10, 1910, to Jan. 30, 1934, claiming said lands as their own and excluding all other persons therefrom.

"I find that the plaintiffs had constructive notice and actual knowledge of the adverse claim of ownership and actual possession and assertion of ownership of all the defendants to the lands described in their several answers from and after the date of filing the suit in Sulphur Springs (May 31, 1911)."

The finding of the trial court to the effect that appellants had actual notice of the hostile claim and adverse possession of the Markhams is challenged by appellants as being without support in the evidence.

Appellant Mrs. Olive Brosius Williams testified in part as follows:

"Q. Did you know some attorneys at Evansville, Indiana, or in that section of the state, known as Durre & Curry? A. Yes, sir, I knew Judge Curry. I had a speaking acquaintance with Mr. Durre, and I did know Mr. Curry, but he is dead now.

"Q. Will you say that you never knew in your life about those gentlemen filing a lawsuit in Sulphur Springs in connection with this affair? A. No, sir, I don't.

"Q. Did you know about those two gentlemen having business with your mother? A. Yes, sir, they were a firm, and Judge Curry looked after our affairs.

"Q. Do you mean to tell the court that you never heard of that lawsuit in your life? A. Yes, sir, if I knew it, it is out of my knowledge.

"Q. Wasn't that suit filed about the time that attorney (Curry) was assisting in the administration of the estate of your father? A. Yes, sir.

"Q. About 1911 he was engaged as the attorney for your family? A. Yes sir.

"Q. Well, just what matters did he attend to in Indiana in connection with the estate? A. You see, my father died without a will and we didn't know anything about his affairs.

"Q. And you employed Mr. Curry to assist you? A. Yes sir.

"Q. Did you tell him about you having an accounting with Mr. Markham? A. Yes, sir.

"Q. As a matter of fact, when you went back you made a report to him about conditions as you found them here? A. I wouldn't say that I did.

"Q. Well, would you say that you didn't report to Mr. Curry and talk that over with him? A. I just said I had no recollection of anything of the kind.

"Q. Well, you said awhile ago you may have talked with him. A. Well, I may have told him about my father had been in business, naturally I would tell him that, and I did, of course, but I had no knowledge of the suit.

"Q. Your notion is that you just furnished him some information about it? A. Well, naturally he must have some information to do his legal work up there.

"Q. He had no one to get that from but you? A. No.

"Q. After you went back to Indiana from that last trip, did you ever communicate with any of the Markham heirs; I mean the first trip after your father's death, since that time you never in any way personally or by agent, demanded anything out of the Markhams because of your interest out of the partnership? A. Mr. Curry came down once.

"Q. What did he come for? A. He came down to look things over, and he came back and reported that there was nothing here.

"Q. How came him to come? A. He wanted to find out about that.

"Q. You paid his expenses? A. Yes, sir.

"Q. You sent him here to investigate the matter? A. Yes, sir.

"Q. And he came back to Indiana and told you there is nothing here to expect anything out of? A. Yes, sir.

"Q. You had your attorney's advice that there was nothing here that you were entitled to? A. Well, my attorney might have been mistaken.

"Q. Did that man Curry ever tell you that a lawsuit was filed down here? A. No, not to my knowledge.

"Q. Was he ever authorized to file a lawsuit? A. Not to my knowledge.

"Q. Did you know that suit was pending down here? A. No.

"Q. Did you ever know anything about it being filed and dismissed before this petition here? A. In my knowledge I knew nothing about it.

"Q. When was the first time you heard about that lawsuit in Hopkins County,—tell us whether or not you ever heard about it before it was referred to in their answer in this case? A. No. I truly want to answer the questions truthfully; but you know it has been a long while ago, and I dismissed the matter from my mind and I never heard of it until recently, but I can't tell you just when.

"Q. Mr. Curry was recognized in his country as a high-class attorney? A. Yes, sir; he was supposed to be, I didn't know anything about him personally, and he had a good practice.

"Q. Now, at that time you and your family employed him to come down here and look after your business and affairs, and to do the things he thought necessary to the best interest of your estate? A.

Well, that is the way any one would do. We didn't know him ourselves, we were at sea, and some of our friends recommended Mr. Curry and we didn't know him at all; and, woman-like, we hadn't had any business experience at all and we hired Mr. Curry.

"Q. And you hired him to come down here? A. Not right then.

"Q. Well, about 1911? A. It might have been about then.

"Q. Now, you having come and not finding anything of special interest, you hired an attorney to come down here and look into the matter and to do what he thought was necessary, and advise you? A. Yes, sir.

"Q. And he came down here, and came back and made some report to you? A. Yes, sir.

"Q. You wouldn't tell the court that he didn't come back and discuss that lawsuit with you? A. I wouldn't tell the court anything. That has been a long while ago and I don't remember anything, but I have no knowledge of that lawsuit you are speaking of."

Mrs. Ruth Brosius Seibert testified in part as follows:

"Q. You were living at home in Indiana at the time of your father's death? A. I was.

"Q. What was your age at that time? A. I was in my eighteenth year, and he died that summer.

"Q. I believe you were married just after you were twenty-one? A. Yes, sir.

"Q. And you remained there some four years after the death of your father? A. Yes, sir.

"Q. Along about 1911 you were nineteen years old? A. Yes, sir.

"Q. Where were you during 1911? A. I was in my family home.

"Q. Do you remember your sister coming to Texas? A. Yes, sir, but she didn't come in 1911.

"Q. Well, when did she come? A. It was either 1909 or 1911.

"Q. When did Mr. Curry come down here? A. He came while we lived at the country place.

"Q. When was that? A. I don't know whether it was 1909 or 1910.

"Q. Do you remember Mr. Curry coming to Texas? A. Yes, sir.

"Q. Did you ever talk to Mr. Curry? A. No, sir.

"Q. Leaving it naturally to your Mother? A. Yes, sir.

"Q. Your mother was looking after your interest? A. No, sir; she wasn't. She wasn't my guardian.

"Q. She did in fact advise you? A. Naturally, she did.

"Q. Mr. Curry came in the interest of your affairs just like he did your mother and sister? A. I suppose so."

We think appellants' testimony together with the other facts and circumstances in the case, reasonably warrant the inference that notice of Markham's hostile claim and adverse possession was actually brought home to appellants as found by the trial court. It is not unreasonable to conclude that the report made in 1911 to appellants by their lawyer, a reputable attorney, contained the true facts as he found them; among which were that J. L. Markham, acting as survivor of the partnership, had conveyed the property to himself individually in consideration of his payment of the partnership debts amounting to more than its value and that he, Markham, was then in exclusive possession of the property, claiming it as his own. This inference is in accord with the fact that appellants dismissed the entire matter from their minds and took no further interest in the property or indebtedness after receiving the report. That appellants do not now remember such facts may reasonably be accounted for in having dismissed them from their attention for so long a period of time.

However, it was not necessary that actual notice of appellees' adverse holding and disseisin be brought home to appellants. Such notice may be constructive, and will be presumed to have been brought home to the cotenant out of possession when, as here, the adverse occupancy and claim of title is so long continued, open, notorious, exclusive, and inconsistent with the existence of any title in others, except the occupant, that the law will raise the inference of notice to the cotenant out of possession; or the jury may rightfully presume such notice. Moore v. Knight, 127 Tex. 610, 94 S.W.2d 1137.

We have examined all of appellants' remaining propositions, and after due consideration they are respectfully overruled.

The judgment of the trial court is affirmed.